J-S18030-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| IN RE: R.T., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.B., NATURAL MOTHER | : | No. 1767 WDA 2017 |

Appeal from the Decree Entered October 30, 2017
in the Court of Common Pleas of Somerset County,
Orphans' Court at No(s):  8 Adoption 2016

BEFORE:  STABILE, J., MUSMANNO, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY MUSMANNO, J.:                    FILED JUNE 15, 2018

S.B. ("Mother") appeals from the Decree granting the Petition, filed by the Somerset County Children and Youth Services ("CYS" or the "Agency"), seeking to involuntarily terminate her parental rights to her dependent, female child, R.T. ("Child") (born in December 2013), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[1]  We affirm.

Child was adjudicated dependent on November 19, 2014.  After an initial placement in foster care, she has been in the same foster care placement, with her pre-adoptive foster care parents, since March 23, 2015.  On March 1, 2016, the trial court found aggravated circumstances existed as to Father, relieving the Agency of any further efforts of reunification between Child and Father.  See Petition for Involuntarily Termination of Parental Rights for Birth Father, Exhibit D (Aggravated Circumstances Order, 3/1/16); 42 Pa.C.S.A.

_____

[1] On October 30, 2017, the trial court also terminated the parental rights of the father of Child, T.T. ("Father").  Father has not filed a brief in the present appeal, nor has he filed a separate appeal.

§ 6341.  On May 18, 2016, the trial court changed Child's permanency goal to adoption.  See 42 Pa.C.S.A. § 6351.

On June 14, 2016, the Agency filed Petitions to involuntarily terminate both Mother's and Father's parental rights to Child.  On that same date, the Agency filed a Motion for aggravated circumstances against Mother.  On October 19, 2016, the trial court found that aggravated circumstances existed as to Mother, relieving the Agency of any further efforts of reunification between Child and Mother.  N.T., 10/27/17, at 221.

After several continuances, the trial court held an evidentiary hearing, on the termination Petitions as to Mother and Father, on October 27, 2017. Mother appeared at the hearing with her counsel, and testified on her own behalf.  Father also appeared with his counsel, but did not testify and, with the court's acknowledgment, he left to attend intensive outpatient treatment. Id. at 159.  Child's guardian ad litem, Tiffany Stanley, Esquire ("Attorney Stanley"), appeared and questioned witnesses.  Id. at 4-5.  The trial court determined that, given Child's age of three, Attorney Stanley could represent both Child's best interests, as guardian ad litem, and Child's legal interests, as her counsel, without any conflict of the two interests.[2]  Id. at 5.  At the hearing, the Agency presented the testimony, via telephone, of Carol

_____

[2] See In re D.L.B., 166 A.3d 322, 329 (Pa. Super. 2017) (expanding upon the Pennsylvania Supreme Court's decision in In re: Adoption of L.B.M., 161 A.3d 172 (Pa. 2017), and explaining that an attorney serving as a child's dependency guardian ad litem may serve as his or her counsel, so long as the child's legal and best interests are not in conflict).

- 2 -

Patterson ("Dr. Patterson"), the licensed psychologist who performed a bonding and attachment assessment of Child. Id. at 11-12. The Agency then presented the testimony of Andrea Palguta ("Palguta"), the caseworker assigned to the case from December 2013 until June 17, 2015. Id. at 43-44, 48. Next, the Agency presented the testimony of Julia Bloom, the caseworker assigned to the case in January 2016. Id. at 97. Mother then testified on her own behalf. Id. at 132.

The trial court set forth the following procedural history and factual background regarding this appeal:

> [Child] was initially referred to [CYS] on the date of [Child's] birth based upon a positive drug screen of [Mother] that occurred in November of 2013[,] and further[,] as a result of [Mother's] admitting to using drugs that were not lawfully prescribed to her.
>
> The family was [recommended] for general protective services on or about February 14, 2014, after the [A]gency determined that such services were appropriate.
>
> A family service plan was created on April 23, 2014, which established certain goals for both [Mother] and [Father]. Those goals consisted, among other things, of [Mother] and [Father] being required to maintain sobriety and avoid any drug relapse.
>
> They were also required to attend and successfully complete drug and alcohol counseling and to submit to random drug screens.
>
> The parents were also required to care for [Child] in a safe manner[,] and to make certain that [Child] was always under the supervision of a responsible and sober adult.

[Mother and Father] were also required to make certain that [Child] received regular medical care and any emergency care if necessary.

Additionally, during this time period, the [A]gency provided services to [Mother] and [Father] to assist them and help them with meeting these goals.

The services consisted of, among other things, parenting services and parenting classes, random drug screens, assistance with transportation, education on safe sleep practices, and contact with [Mother and Father's] drug and alcohol treatment providers.

It is apparent that [Mother and Father] did not comply with these goals. Evidence of that is found in that [Mother and Father] did not successfully complete the parenting classes and services.

On or about July 26, 2014, [Child] became ill with a high fever and exhibited seizure-like conditions. Subsequent to that event, [Mother] did not take [Child] for follow-up medical appointments or medical care.

Additionally[, Child] developed gastroenterology issues, and the [trial court found] that [Mother] did not follow through with recommendations to try different formulas in an effort to address these issues.

Additionally, the [trial court found] that [Child] became ill and required a barium enema at Children's Hospital, and … [Mother] did not follow up with subsequent care.

Although early intervention evaluation was recommended, [Mother] did not have this completed.

A four-month review of the family service plan was conducted and, on or about August 12, 2014, none of the goals were removed. At that time, an additional goal was added in that [Father] was required to seek drug and alcohol treatment.

Random drug screens for [Mother] were conducted on March 12, 2014, and at that time [M]other tested positive for Suboxone. Mother also admitted to using Subutex and

- 4 -

admitted that she did not possess a valid prescription for that medication.

On May 5, 2014, an oral drug screen was conducted with negative results. However, [Mother] admitted to the use of Suboxone or Subutex and that she did not possess a valid prescription for that drug.

On or about May 15, 2014, a urine screen of [M]other was conducted, and the test results were negative for the substances tested for. However, [Mother] admitted to using drugs a few hours prior to that visit.

Additionally, the [trial court found] credible the testimony of [] Palguta that on many other home visits ... [Mother] admitted to using Suboxone or Subutex[,] and that [M]other admitted getting these drugs from others and not having a valid prescription for those drugs.

* * *

Subsequently, on October 31, 2014, [Child] was taken into placement. The circumstances that led to the placement of [Child] ... were that [Mother] had entrusted [Child] to a friend or friends[,] who later contacted the [A]gency and indicated that they had been [caring for Child] for a period of time[,] and could not locate the whereabouts of [Mother] for the past eight days.

[Child] was taken into placement and placed into a foster home. However, it was later determined that the initial foster family could not provide permanency, and then [Child] was moved to a subsequent foster home[,] where [Child] still remains today.

At or about this time, it appears that there was a warrant outstanding for [Mother's] arrest, and that [Mother] admitted to, ["]being on the run,["] and as a result knew that [Child] was in placement with CYS[,] but yet neglected to contact CYS in an effort to have [Child] returned to her. Subsequently, [Mother] was arrested and incarcerated based on the outstanding warrant.

On November 3, 2014, the [c]ourt conducted a shelter care hearing and a 72-hour review hearing. Neither [Mother nor Father appeared]. However, [Father later appeared,] as he was then being housed in the Somerset County Jail and was brought to court from the jail. Subsequently, [Child] was adjudicated dependent on November 19, 2014.

A child permanency plan was created for [Child] on May 5, 2016, along with court-ordered goals consistent with [Child's] permanency plan.

The goals included that the [Mother and Father] undergo drug and alcohol assessments and successfully complete services recommended by any such evaluation.

[Mother and Father] were also required to submit to random drug screens and attend visits with [Child,] as scheduled by CYS. [Mother and Father] were also required to attend medical and dental visits for [Child].

[Mother and Father] were required to obtain and maintain stable housing. [Mother and Father] were required to submit evidence of financial stability and evidence of their ability to provide for [Child's] needs and welfare. A concurrent goal of adoption was later added to [Child's] permanency plan.

After the date of placement, the [trial court found] that there is no evidence that [Mother] completed or successfully completed the drug and alcohol treatment programs until very recently, in fact in June of 2017.

Additionally, [Mother] did not confirm with the [A]gency a source of income or employment, and [Mother] did not attend scheduled medical and dental appointments for [Child], nor did [Mother] inquire regarding the results of these appointments.

\* \* \*

The [trial court found] that visits were scheduled by the [A]gency with [Mother and Father]. However, [Mother and Father] were not consistent in attending these visits.

With respect to [Mother], seven visits were scheduled, and [Mother] failed to appear for the visits scheduled on

November 20, 2014, November 26, 2014, December 3, 2014, and December 10, 2014.

With respect to the final three visits, the [trial court found] that [Mother] became incarcerated on or about December 12, 2014, and therefore was unable to physically attend those visits.

On or about January 7, 2015, the [A]gency took [Child] to the Somerset County Jail to visit with [Mother,] because [Mother] was incarcerated.

Subsequently, [Mother] was transferred from the Somerset County Jail to the State Correctional Institution at Muncie. After being transferred to the State Correctional Institution at Muncie, [Mother] wrote letters to the caseworker. There were a total of three letters.

The first letter was a thank you for the visit that occurred at the Somerset County Jail on January 7, 2015. The subsequent two letters were letters with reference to attempting to establish visits at SCI Muncie.

The [trial court found] that it was necessary for a State Correctional Institution form regarding visits with minors to be completed and returned[,] which was done by the [A]gency caseworker. However, [Mother] never contacted the [A]gency subsequently to confirm that visitations were eligible and approved by SCI Muncie [sic].

* * *

The [trial court found] that [Mother and Father] have not been consistent with achieving or complet[ing] their goals and[,] in fact[,] have not completed any of the goals. During this time period, [Mother and Father] failed to provide the necessary parental care and duties to [Child].

In approximately June of 2015, [] Palguta was no longer involved as the caseworker in this case, and subsequently[,] the case was transferred to the [A]gency's placement unit.

At that time, Catherine Quinn became the caseworker on the case, and then subsequently the case was transferred to

Caseworker Jacob Zerby. In or about ... January 2017, Julia Bloom became the caseworker in the CYS placement unit.

The [trial court found] that, from the time of initial placement with the [A]gency in October of 2014, [Child] never returned to the custody of either [Mother or Father].

The [c]ourt further finds that [Child] has been placed with the current foster parents since March of 2015.

The [trial court found] that [Mother] was subsequently released from incarceration on or about November 2, 2015, and that visits with [Child] resumed on November 18, 2015, with a second visit occurring on December 2, 2015.

Thereafter, the [A]gency lost contact with [Mother] for approximately nine months, and no additional visits with [Mother] occurred until September 8, 2016. During this interval, the [A]gency did not know of the whereabouts of [Mother], although they attempted unsuccessfully to locate her.

On or about March 16, 2016, the [A]gency determined or believed that [M]other was a resident in a rehabilitation facility at Gateway. At that time, the [A]gency attempted to contact [Mother], although their contact was unsuccessful, and[,] in fact[, Mother] refused to sign a form authorizing Gateway to speak with the [A]gency. During this nine-month interval, no one[,] including [Mother,] contacted the [A]gency to inquire with regard to the status of [Child].

The [trial court found] that the goal of reunification was changed to adoption on or about May 18, 2016, and that the [c]ourt determined that there were aggravated circumstances on or about October 19, 2016, thereby relieving the [A]gency of any further efforts of reunification [as to Mother].

The [trial court found] that in February 2017[,] a bonding study was performed by [Dr.] Patterson, a psychologist licensed in the Commonwealth of Pennsylvania. Through this study, [Dr.] Patterson performed a bonding and attachment assessment [of] [Child].

[Dr.] Patterson testified that there is a difference between bonding and attachments. She testified that the bonding process naturally occurs during the first year of [Child]'s life and that the attachment process normally takes approximately three to four years of [Child's] life.

[Dr.] Patterson testified that the setting for the bonding assessment is not as critical or important as the interactions that she observes between the natural parents and the foster parents and [Child].

During her bonding study, [Dr.] Patterson observed [Child] interact with the foster parents in the foster parents' home. The observation lasted for two hours with an additional one-hour interview with the foster parents.

During that bonding study, [Dr.] Patterson observed [Child] … to interact well with the foster parents and to respond in a positive manner with the interactions of the foster parents. [Child] referred to the foster parents as mom and dad.

\* \* \*

Subsequently, on February 27, 2017, a bonding assessment was done between [Child] and [Mother]. This again included a two-hour observation period with a one-hour interview period.

During the observation, [Child] did not refer to [Mother] in any way[,] and again exhibited patterns of regressive speech. [Child] did not display any affectionate behavior toward [Mother], and [Child] displayed many negative responses to [Mother's] approaches.

During the interview, [Mother] reported long-term drug usage and mental health issues, and [M]other confirmed being incarcerated from the latter part of 2014 through October 2015. [Mother] also admitted that she was on the run due to an outstanding arrest warrant.

Although [Child] appeared to be acting normal and happy during the first hour of the observation, during the second hour of the observation[,] [Child] indicated that she wanted to see her foster mother.

[Dr.] Patterson issued a report detailing her findings during the bonding study and concluded that [Child's] best interests would not be served by reunification with [Mother] and [Father].

She further opined that reunification would not be possible due to [Father] and [Mother] having failed to complete the recommended goals and services.

[Dr.] Patterson opined that [Child] needs permanent arrangements [other than those that Mother] and [Father] can provide.

She also opined that [Child] demonstrated a positive bond with the current foster parents[,] and did not demonstrate or exhibit any bond with [Mother or Father].

[Dr.] Patterson opined that she believes that permanency for [Child] can only be achieved by [Child] remaining with the current foster parents; and, she further opined that it is her belief that if [Child] were removed from the care of the current foster parents that [Child] would be harmed emotionally, physically, psychologically, and developmentally since [Child] has in fact developed a bond with the current foster parents and does not have a bond with [Mother and Father].

Id. at 212-25.

On October 30, 2017, the trial court entered the Decree terminating Mother's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). On November 22, 2017, Mother timely filed her Notice of Appeal, along with a Concise Statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

In her brief on appeal, Mother raises one issue: "Whether the [t]rial [c]ourt erred by terminating the [Mother's] parental rights under 23 Pa.C.S.A.

- 10 -

§ 2511(a)(1), 23 Pa.C.S.A. § 2511(a)(2), 23 Pa.C.S.A. § 2511(a)(5), 23

Pa.C.S.A. § 2511(a)(8) and 23 Pa.C.S.A. § 2511(b)[?]" Mother's Brief at 1.[3]

In reviewing an appeal terminating parental rights, we adhere to the

following standard:

> [A]ppellate courts must apply an abuse of discretion
> standard when considering a trial court's determination of a
> petition for termination of parental rights.  As in dependency
> cases, our standard of review requires an appellate court to accept
> the findings of fact and credibility determinations of the trial court
> if they are supported by the record.  In re: R.J.T., ... 9 A.3d 1179,
> 1190 (Pa. 2010).  If the factual findings are supported, appellate
> courts review to determine if the trial court made an error of law
> or abused its discretion.  Id.; R.I.S., 36 A.3d 567, 572 (Pa. 2011)
> (plurality opinion)].  As has been often stated, an abuse of
> discretion does not result merely because the reviewing court
> might have reached a different conclusion.  Id.; see also Samuel
> Bassett v. Kia Motors America, Inc., ... 34 A.3d 1, 51 (Pa.
> 2011); Christianson v. Ely, 838 A.2d 630, 634 (Pa. 2003).
> Instead, a decision may be reversed for an abuse of discretion
> only upon demonstration of manifest unreasonableness, partiality,
> prejudice, bias, or ill-will.  Id.
>
> As [the Supreme Court] discussed in R.J.T., there are clear
> reasons for applying an abuse of discretion standard of review in
> these cases.  [The Supreme Court] observed that, unlike trial
> courts, appellate courts are not equipped to make the fact-specific
> determinations on a cold record, where the trial judges are
> observing the parties during the relevant hearing and often
> presiding over numerous other hearings regarding the child and
> parents.  R.J.T., 9 A.3d at 1190.  Therefore, even where the facts
> could support an opposite result, as is often the case in
> dependency and termination cases, an appellate court must resist

---

[3] Although Mother stated her issue somewhat differently in her Concise
Statement, we find that she sufficiently preserved her issue for review.  See
Krebs v. United Refining Co. of Pa., 893 A.2d 776, 797 (Pa. Super. 2006)
(holding that an appellant waives issues that are not raised in both his or her
concise statement of errors complained of on appeal and the Statement of
Questions Involved in his or her brief on appeal).

the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. In re Adoption of Atencio, 650 A.2d 1064, 1066 (Pa. 1994).

In re Adoption of S.P., 47 A.3d 817, 826-27 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. In re R.N.J., 985 A.2d 273, 276 (Pa. Super. 2009). "The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." Id. (internal quotation marks and citation omitted).

This Court may affirm a trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). In re B.L.W., 843 A.2d 380, 384 (Pa. Super. 2004) (en banc). We will consider the trial court's termination of Mother's parental rights pursuant to section 2511(a)(2) and (b). Section 2511 provides, in relevant part, as follows:

§ 2511. Grounds for involuntary termination

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and

> causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * *
>
> (b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

To satisfy the requirements of section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. In re Adoption of M.E.P., 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. In re A.L.D. 797 A.2d 326, 337 (Pa. Super. 2002).

In In re Adoption of S.P., our Supreme Court revisited its decision in

In re: R.I.S., regarding incarcerated parents, and stated the following:

[W]e now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S.A. § 2511(a)(2). See e.g. Adoption of J.J., 515 A.2d 883, 891 (Pa. 1986) ("[A] parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties."); [In re:] E.A.P., [944 A.2d 79, 85 (Pa. Super. 2008)] (holding termination under § 2511(a)(2) supported by mother's repeated incarcerations and failure to be present for child, which caused child to be without essential care and subsistence for most of her life and which cannot be remedied despite mother's compliance with various prison programs). If a court finds grounds for termination under subsection (a)(2), a court must determine whether termination is in the best interests of the child, considering the developmental, physical, and emotional needs and welfare of the child pursuant to § 2511(b). In this regard, trial courts must carefully review the individual circumstances for every child to determine, inter alia, how a parent's incarceration will factor into an assessment of the child's best interest.

In re Adoption of S.P., 47 A.3d at 830-31.

In the instant case, with regard to section 2511(a)(2), the trial court

stated the following:

THE COURT: Specifically, we find that there was no contact between [Mother] and [Child] from the period of December 2[], 2015, through September 8, 2016, which includes the six-month period immediately preceding the filing of the [P]etition.

We further find that the [A]gency has proven by clear and convincing evidence grounds for involuntary termination of [Mother]'s parental rights under Section 2511(a)(2) in that

there has been a repeated and continued neglect or refusal of [Mother] to provide the essential parental care, control, and subsistence necessary for the physical and mental well-being of [Child,] and that the conditions and causes of the neglect or refusal cannot or will not be remedied by [the] parent. This is clear based upon the failure of [Mother] to achieve the goals set in the permanency plan.

N.T., 10/27/17, at 228.

In her brief, Mother contends that the Agency failed to make reasonable efforts to assist her in reunifying with Child, while she was incarcerated between December 2014 and December 2016, and that the Agency was aware that, during the seven months prior to the termination Petition being filed, she was living in an apartment and working at a fast-food restaurant. Mother's Brief at 22-24. Mother complains that the Agency did not conduct a home visit or review the living arrangements she had to offer Child, nor did it consider that she was employed. Id. at 23. Mother also states that she was undergoing drug screens while she was released on parole, and that the Agency was taking care of Child's health care and medical needs. Id. Mother asserts that, as such, the circumstances that led to the placement of Child, i.e., her continued drug use and Child's health care and medical concerns, had been alleviated. Id.

Mother claims that the Agency violated her guarantees to free speech and due process, under the First and Fourteenth Amendments to the United States Constitution, respectively, by failing to communicate

with her and denying her liberty interest in parenting. Id. at 24. Mother cites, in support, our Supreme Court's decision in In the Interest of: D.C.D., a Minor, 105 A.3d 662, 673-74, 676 (Pa. 2014). Mother's Brief at 22. She argues that the situation in D.C.D. is distinguishable from the instant matter in that the father in D.C.D. was incarcerated long-term, for a period of 7¾ years to 16 years, and the child had been removed from his care at birth, and, consequently, had no bond with him. Id. Mother argues that here, she had a short-term incarceration, and that it was the failure of the Agency to communicate with her that violated her free speech and restricted her liberty interest, and prevented her from being a parent. Id. at 24.

After reviewing the record, we do not agree that the Agency prevented Mother from parenting Child by failing to communicate with her, and by depriving of her of her liberty interest in raising Child. Regarding substantive due process, in the context of dependency proceedings under the Juvenile Act, this Court has stated:

> [I]n a dependency case, the liberty interest of [a parent] is not at stake and the risk of erroneous adjudication is so substantially mitigated by safeguards, reviews, and procedures directed toward uniting the family, that due process requires a less didactic approach than in criminal procedures. And, while a dependency proceeding is adversarial in the sense that it places the state in opposition to the parent with respect to the custody of the child . . . it does not implicate the liberty interests of the parent or the child as would be the case of a defendant in a criminal action.

In re M.B., 869 A.2d 542, 546-47 (Pa. Super. 2005) (internal citations and quotation marks omitted). The due process protections afforded in a dependency proceeding, therefore, are not as comprehensive as in a criminal trial. Id. Further, the Mother cannot assess blame on the Agency for her failure to communicate with the Agency and to make sufficient efforts to become reunified with Child.

In D.C.D., our Supreme Court rejected the suggestion that an agency must provide reasonable efforts to enable a parent to reunify with a child prior to the termination of parental rights. In re D.C.D., 105 A.3d at 672-73. Specifically, the Supreme Court rejected the suggestion that section 2511 of the Adoption Act should be read in conjunction with section 6351 of the Juvenile Act, particularly 42 Pa.C.S.A. § 6351(f)(9)(iii). In re D.C.D., 105 A.3d at 673. The Supreme Court explained that "[i]nstead of a requirement to provide reasonable efforts prior to the filing of a termination petition, [s]ection 6351 actually creates an exception that excuses the filing of an otherwise required termination petition ...." Id. at 673. Based on our Supreme Court's holding in D.C.D., we find no merit to Mother's argument.

After a careful review of the record, we conclude that the trial court's decision to terminate the parental rights of Mother under section 2511(a)(2) is supported by competent, clear and convincing evidence in the record. See In re Adoption of S.P., 47 A.3d at 826-27. Thus, we discern no abuse of discretion in the trial court's termination of Mother's parental rights to Child

pursuant to section 2511(a)(2), and we proceed to an analysis of section 2511(b).

This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). See In re Adoption of C.L.G., 956 A.2d 999, 1008 (Pa. Super. 2008) (en banc). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." In re K.M., 53 A.3d 781, 791 (Pa. Super. 2012). In In re E.M., 620 A.2d [481,] 485 [(Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. In re K.M., 53 A.3d at 791.

In re: T.S.M., 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." In re Z.P., 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances … where direct observation of the interaction between the parent and the child is not

necessary and may even be detrimental to the child." In re K.Z.S., 946 A.2d 753, 762 (Pa. Super. 2008).

> A parent's abuse and neglect are likewise a relevant part of this analysis:

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in and of itself, or when considered in connection with a child's feeling toward a parent, to establish a de facto beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

In re K.K.R.-S., 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. See In re K.Z.S., 946 A.2d at 763 (affirming the involuntary termination of parental rights, despite the existence of some bond, where placement with the mother would be contrary to the child's best interests). "[A] parent's basic constitutional right to the custody and rearing of … her child is converted, upon the failure to fulfill … her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." In re B.,N.M., 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

With regard to section 2511(b), the trial court stated the following:

> The [c]ourt moves on to the considerations under Section 2511(b) of the Adoption Act[,] where the [c]ourt[,] in terminating the [Mother and Father's] parental rights[,] gives primary consideration to the developmental, physical, and emotional needs and welfare of [Child].

> The [trial court found][,] by clear and convincing evidence[,] that both [Father and Mother] have not provided the parental duties[,] and the care and attention to [Child] necessary for [Child] to develop physically and emotionally and for [Child] to develop a bond with [Mother and Father].

> The [trial court found] that, within the first year of [Child's] life, [Child] was removed from the care of the natural parents[,] and that [Child] has been in placement since October 13, 2014. Since that time, [Mother and Father] have had very little consistent contact with [Child]. During the majority of that time, [Child] has resided with the current foster parents.

> We find the evidence submitted by [Dr.] Patterson[,] through her bonding study and report[,] to be persuasive in that there is no bond existing between [Mother and Father] and [Child,] and that, by severing the parental rights of [Mother and Father], it would not have a negative effect on [Child] because the [] parent-child bond does not exist.

> In fact, [Dr.] Patterson concluded that to remove [Child] from the care of the foster parents would have a negative effect on [Child] because [Child] has[,] in fact[,] developed a bond with the foster parents and views the foster parents as being her parents.

> [Dr.] Patterson also opined that [Child] does not view [Mother] as being her biological mother, and [C]hild does not view [Father] as being her natural father.

> Furthermore, the [c]ourt[,] in this analysis under Section 2511(b)[,] cannot consider any efforts by [Mother and Father] to remedy the conditions[,] described previously[,] that are first initiated subsequent to being given notice of the filing of the involuntary termination [P]etitions.

The [trial court found] that many of the efforts by [Mother and Father] to attempt to remedy the issues in this matter occurred subsequent to the filing of the [P]etitions on June 14, 2016 ....

Therefore, based on the foregoing findings and conclusions, I am going to execute the proposed [O]rders of court[,] provided by the [A]gency[,] terminating the parental rights of both [Father and Mother].

N.T., 10/27/17, at 229-32.

Our review discloses that the trial court's decision to terminate the parental rights of Mother under section 2511(b) is supported by competent, clear and convincing evidence in the record. See In re Adoption of S.P., 47 A.3d at 826-27. We discern no abuse of discretion by the trial court in finding that no bond between Child and Mother exists, and that Child would suffer no permanent emotional harm if Mother's parental rights were terminated. Thus, we affirm the trial court's termination of Mother's parental rights to Child pursuant to section 2511(b).

For the foregoing reasons, we affirm the Decree terminating Mother's parental rights with regard to Child under section 2511(a)(2) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  6/15/2018

- 21 -